TAIT & HALL, PLLC
4455 E. Camelback Rd., Suite C250
Phoenix, Arizona 85018
(480) 405-6767
Facsimile: (480) 405-6768
Email: admin@taitandhall.com
*Attorneys for Plaintiff*
By: Ryan Tait #025783

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| YESSENIA GARCIA, an individual;, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SCOTTSDALE, a public entity; CITY OF SCOTTSDALE POLICE DEPARTMENT, a public entity; BRIAN STEEL, an individual; BEN ROBERSON, an individual; KAVON ATTORPOUR, an individual; C. MALLEY, an individual; J. GHIGLIA, an individual; N. FAY, an individual; ENTITIES 1-25, entities; and DOES 1 through 25, inclusive, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT** |

For her Complaint, Plaintiff YESSENIA GARCIA, upon personal knowledge and upon information and belief, alleges the following:

**JURISDICTION AND VENUE**

1. Plaintiff brings this action pursuant to 42 U.S.C. § 1983.

2. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction is also conferred by 28 U.S.C. § 1331 because the claims for relief derive from the United States Constitution and the laws of the United States. Jurisdiction to grant Declaratory/Injunctive Relief is conferred by 28 U.S.C. § 2201 and 42 U.S.C. §1983.

3. Venue before this Court is proper because the acts and omissions complained of herein occurred in Arizona and all of the parties currently reside in the State of Arizona.

## PARTIES

4. At all times relevant to this Complaint, Plaintiff, Yessenia Garcia was a single woman, residing in the County of Maricopa, State of Arizona.

5. Plaintiff is an individual and citizen of the United States.

6. Defendant City of Scottsdale ("City") is a municipality organized and existing under the laws of the State of Arizona. As the employer of Scottsdale Police Department ("SPD") police officers, City had primary responsibility for the training, education, and supervision of those police officers. Plaintiff is informed and believes and thereon alleges that it was City which promulgated, encouraged, administered, and/or permitted, the policies, practices, customs, and procedures under which the individual Defendant employees of City committed the acts or omissions complained of herein.

7. Defendant Scottsdale Police Department ("Police" or "SPD") is a law enforcement subunit of City. As the employer of police officers, SPD had primary responsibility for the training, education, and supervision of those police officers. Plaintiff is informed and believes and thereon alleges that it was SPD which promulgated, encouraged, administered, and/or permitted, the policies, practices, customs, and procedures under which the individual Defendant employees of SPD committed the acts or omissions complained of herein.

8. Defendant Bryan Steel ("Steel"), at all relevant times herein, is an individual employed as an SPD police officer.

9. Defendant Ben Roberson ("Roberson"), at all relevant times herein, is an individual employed as an SPD police officer.

10. Defendant Kavon Attarpour ("Attarpour"), at all relevant times herein, is an individual employed as an SPD police officer

11. Defendant C. Malley ("Malley"), at all relevant times herein, is an individual employed as an SPD police officer

12. Defendant J. Ghiglia ("Ghiglia"), at all relevant times herein, is an individual employed as an SPD police officer.

13. Defendant N. Fay ("Fay"), at all relevant times herein, is an individual employed as an SPD police officer.

14. Those Defendants who at relevant times herein were employed by SPD are sometimes referred to herein as "SPD officers".

15. Defendants ENTITIES 1 through 25 are sued as fictitious names, their true names and capacities being unknown to Plaintiff. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names. On information and belief, Plaintiff makes all allegations contained in this Complaint against all Defendants, including ENTITIES 1 through 25.

16. Defendants DOES 1 through 25 are sued as fictitious names, their true names and capacities being unknown to Plaintiff. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names. On information and belief, Plaintiff

makes all allegations contained in this Complaint against all Defendants, including DOES 1 through 25.

## FACTUAL BACKGROUND & GENERAL ALLEGATIONS

17. On May 24, 2020, Yessenia Garcia ("Garcia") drove to downtown Scottsdale and parked her car at 8:43 p.m. in a parking space on the south side of E. Shoeman lane, immediately north of the Galleria Corporate Center at 4343 N. Scottsdale Rd., Scottsdale, Arizona.

18. From there, Ms. Garcia walked with her boyfriend, Kyle Thompson ("Thompson") to nightclub Casa Amigos to meet friends for a social gathering. Ms. Garcia socialized with her group of friends for some time before the group walked from Casa Amigos to nightclub HiFi.

19. Ms. Garcia consumed three alcoholic beverages over the course of the evening.

20. At approximately 10:02 p.m., an unknown male leapt onto the hood of Ms. Garcia's parked car and stomped on the windshield, shattering the glass.

21. While Garcia and friends were at HiFi, at 10:46 p.m., Officer N. Fay ("Fay") and Sergeant Bryan Steel ("Steel") were SPD Police Officers on bicycles and were located on top of the Galleria Parking garage located east of the Galleria Corporate center.

22. From that vantage point, Fay observed Petrolina Tucari ("Tucari") engaged in a verbal altercation with an unidentified taxi driver and Gus's Pizza employee Laury Angelos ("Angelos") in front of Gus's Pizza, located at 7333 E. Shoeman Ln..

23. Fay observed Angelos making a phone call as he stood by the unidentified male. Assuming the guard was calling police, Fay advised Steel who rode his bike to the scene of the altercation. Fay observed Tucari taunt the unidentified male before walking out of Fay's line of sight. Shortly thereafter, at 10:48 p.m., Fay received a radio call notifying him of the hit and run accident. Fay then responded to the scene of the accident and learned that Tucari had been struck by a black passenger vehicle on E. 6th Avenue on the north side of VIP Spa, located at 7357 E. 6th Ave, Scottsdale, AZ. Fay further learned that the vehicle had fled

westbound on 6th Avenue and turned north on Drinkwater Blvd. He then followed the reported course of the fleeing vehicle on bike pedaling east on 6th Avenue, then North on Drinkwater Blvd. He then travelled North on Scottsdale Rd before turning East on E. Shoeman Lane, where he observed a damaged vehicle he determined to be unrelated to the investigation.

24. As the accident was occurring, Thompson and Garcia were still inside HiFi. Garcia's vehicle was parked in the same location it had been in since they arrived in the club district.

25. At approximately 11:10 p.m., Thompson closed his tab and walked, with Garcia to Garcia's car on E. Shoeman Lane.

26. When Thompson and Garcia arrived at her car, they discovered that the windshield had been shattered.

27. Thompson and Garcia noticed Officers Fay and Kavon Attarpour ("Attarpour") nearby to the west. At approximately 11:16 p.m. Thompson approached them to report the damage to the vehicle.

28. That Fay and Attarpour were investigating a hit and run accident was unknown to Thompson and Garcia at the time. Thompson advised Officer Fay of the damage to Garcia's black Mazda. Thompson further advised that he and Garcia had returned the vehicle to find it damaged.

29. Steel then approached the group as Fay confronted Thompson with information regarding the collision. Thompson adamantly denied involvement and explained that he and Garcia had been together in the nightclubs throughout the evening and that they had not moved the car since they parked it there at approximately 9 p.m.. Thompson explained that he and Garcia had just walked to the car from HiFi to discover the damage. Steel responded by stating that they knew the car had just been involved in a hit and run. Fay stated that the hood was warm enough to confirm that the car had just been driven.

30. In an apparent attempt to elicit a confession regarding the hit and run, Steel told Thompson that there were circumstances leading up to the accident that could help him. Thompson stated that they had not driven anywhere. Steel then accused him of lying and walked away.

31. At approximately 11:23 p.m., Fay then went into the Galleria to review the surveillance video of the Galleria's north parking lot area.

32. Steel returned to speak with Thompson as Officer C. Malley stood by. Steel again told Thompson to be honest. Thompson responded that he was being honest. Steel repeatedly insisted that they knew the car had been involved in a hit and run accident, which Thompson adamantly denied, pointing out that he had the keys in his pocket and there was no way for someone else to have driven the car. Steel told Thompson they were going to pull surveillance video from the Galleria. Thompson told Steel that while they were at it, they should pull video from HiFi. Steel responded by saying that if they did so, it would show Thompson and Garcia leaving HiFI well before the accident. In actuality, if they had pulled the video from HiFi, it would have revealed that Thompson and Garcia left HiFi at approximately 20 minutes after the accident.

33. Thompson repeated the same consistent story about what he and Garcia had done during the evening and had not driven the car since it was parked at approximately 9 p.m.. Steel then lied to Thompson and told him that "technically" the person who was hit was at fault because he was fleeing a crime scene. Thompson did not relent in telling Steel truthfully that the vehicle had not been involved in an accident. Thompson then offered to show Steel the transactions he had made at HiFi on his phone to prove the time they had left the club and Steel refused to allow Thompson to show him transactions he had made on his credit card at the bar. Attarpour was present for this conversation.

34. Meanwhile, Fay was reviewing Galleria surveillance video and discovered that Garcia's vehicle was captured by the cameras parking at 8:45 p.m. in the same parking spot it was later discovered damaged. Officer Fay concluded that the video surveillance was

inconclusive as to whether Garcia's vehicle was involved in the hit and run accident due to the fact that the camera panned east and west and there were segments of the video recording where the vehicle was out of frame.

35. Contrary to Officer Fay's erroneous conclusion, the video surveillance actually establishes conclusively that Garcia's vehicle was not involved in the hit and run accident. Ms. Garcia's vehicle is never out of frame for longer than 40 seconds, which would easily have been observed by Officer Fay after a few minutes of watching the constant, repeated pattern of the camera movement. The distance from the parking space to the accident scene would have made it impossible for a driver to drive the vehicle from the parking space to the accident and return to park again in a 40 second time frame.

36. Officer Fay's body cam footage reveals that the security guard at Galleria had the capacity to start the video at any requested time so that Officer Fay could identify whether the car was present in the space at the time of the accident, a time, which Fay knew occurred at precisely between 10:46 and 10:48 p.m.. The video surveillance reveals that Garcia's vehicle was parked in the same space, at the exact same angle, and in the exact position at 10:46:10 p.m., 10:46:37 p.m., 10:46:58 p.m., 10:47:38 p.m. and 10:48:05 p.m.. By reviewing a mere two minutes of surveillance video, Officer Fay could have determined conclusively that Ms. Garcia's vehicle was not involved in the hit and run accident.

37. The surveillance video also showed the true manner in which Ms. Garcia's windshield was damaged when it captured a male jump on the hood and stomp on the windshield at 10:02 p.m.. The surveillance video also showed the damage to Ms. Garcia's windshield prior to the accident.

38. As Officer Fay was inside the Galleria, equipped with a radio by which he could have communicated with officers outside, several officers remained outside investigating Garcia as a suspect of Driving Under the Influence of Alcohol and Hit and Run and questioning Thompson. Throughout the investigation, actions taken by multiple officers revealed that they had little interest in securing any evidence that contradicted their premature

conclusion that Garcia used her vehicle in the hit and run accident and that they fabricated evidence to incriminate her.

39. Officer Doe 1 falsely claimed that he and other officers had been on top of the Galleria parking garage and witnessed the car involved in the accident. Thompson implored for the officers to verify that they had just been in HiFi by checking surveillance cameras, which Doe 1 refused to do or request that any other officer do.

40. As this conversation was occurring, at 11:18 p.m., Officer Doe 2 observed shoe prints on the hood of the car and audibly stated so in Sergeant Steel's presence. These shoe prints were consistent with the manner in which the windshield was broken, but inconsistent with the accident. This information was disregarded because it didn't fit in with the hasty conclusion that the car was involved in the accident.

41. Sergeant Steel also spoke to Garcia, who reported that she had just left HiFi and had not driven the car since she parked it there earlier in the evening. She pled with Steel to speak with the HiFi security guards who could verify that Garcia had been at HiFi when the accident occurred, but Steel declined to do so or direct any other officer to do so.

42. Steel further reported seeing shards of glass in Garcia's blouse. As the surveillance video proves that Ms. Garcia was not in the car anytime between the breaking of the windshield and the time Garcia was contacted by police, it is uncontroversial that this was patently false. As of the date of this notice, the shirt purportedly containing shards of glass is in Scottsdale Police custody, where it has remained in evidence since the event. Scottsdale Police can verify that there are no shards of glass in the shirt.

43. Sergeant Steel also spoke with multiple witnesses who advised him that they were with Garcia immediately prior to her contact with police and that there was no possibility that she would have time to drive her car to the accident location and back in the short time frame that had elapsed.

44. Officer C. Malley observed Ms. Garcia's shirt from a very close distance and first opined that there was no glass in her shirt as he shined his flashlight on her. Steel then

approached and shined his flashlight on her shirt and advised Officer Malley and Officer Attarpour that they were tiny specks on her shirt. Garcia, looking at her shirt as the flashlights shone on her cried out, "where?!" but her question was ignored. Through Attarpour's body cam, it appears clear that there was no glass anywhere on Garcia's shirt or person. Garcia then asks again if they can speak with the security guards at HiFi and Attarpour to seek statements from additional witnesses offered to corroborate Ms. Garcia's alibi.

45. Officer Attarpour took statements from multiple witnesses who advised that they were with Ms. Garcia immediately prior to her contact with police and that the time was insufficient to provide time for Ms. Garcia to be involved in the accident.

46. Officer Roberson violated Ms. Garcia's Constitutional right to counsel by refusing to grant her explicit request for an attorney. After questioning Garcia for several minutes, Ms. Garcia asked "am I being detained?" Officer Roberson replied that she was. Garcia then stated, "ok, then can I get a lawyer?" Roberson replied, "no, you're not entitled to one, you're under investigation." Garcia then responded, "I need to get a lawyer. I didn't do anything…why am I not entitled to a lawyer, sir?" Roberson responded, "because you're not in custody and you're under investigation."

47. Officer Roberson then resumed questioning Ms. Garcia without affording her the opportunity to contact an attorney. Garcia insisted that her car had not moved from the location where she parked it hours earlier.

48. Garcia was ultimately arrested at 12:05 a.m., May 25th, more than thirty minutes after Officer Fay had begun to review the surveillance footage that ultimately exonerated her.

49. Garcia was then taken to the Scottsdale police station where she was subjected to a blood draw only supported by the fact that the officers had ignored the conclusive evidence in their possession proving Ms. Garcia was innocent. She was stripped nude in humiliating fashion in order collect evidence of the fictional glass alleged to have been embedded in her shirt. She was then booked and cited for Possession of Drug Paraphernalia,

two counts of UID and Failure to Stop at the scene of an Accident Causing Injury or Death. She was then released in the early morning hours of May 25th.

50. Rather than complete a thorough investigation, the Scottsdale Police Department then made the decision to release Ms. Garcia's name and unflattering mugshot to the press, where she was depicted in local and national news outlets as the drunk driver in a hit and run accident.

## **CLAIMS FOR RELIEF**

### **COUNT ONE**
*Unwarranted Seizure of Yessenia Garcia*

51. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for a violation of Plaintiff's Civil Rights under the Fourth Amendment to the United States Constitution, with regard to the unlawful seizure of Yessenia.

52. Ms. Garcia is guaranteed important protections under the Fourth Amendment and the Fourteenth Amendment to the Constitution.

53. "The Fourth Amendment provides in part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'. . . [This] 'applies to action by state officers under the Due Process Clause of the Fourteenth Amendment.' . . . Arizona's constitutional counterpart to the Fourth Amendment, Article 2, Section 8, provides that '[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law.' *State v. Guillen*, 223 Ariz. 314, 316-17 (2010) (internal citations omitted). Thus, as a general rule, police may only make an arrest of an individual when in possession or supported by probable cause. *Citation.*

54. After failing to properly consider the available evidence, SPD arrested Yessenia and involuntarily transported her to a holding facility, absent probable cause that she had committed a crime. These actions by SPD constituted an unlawful seizure of Yessenia, violating her Fourth Amendment rights.

## COUNT TWO
### *Violation of Right to Counsel*

55. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for a violation of Plaintiff's Civil Rights under the Fourth Amendment to the United States Constitution, with regard to the unlawful seizure of Yessenia.

56. Ms. Garcia is guaranteed important protections under the Sixth Amendment and the Fourteenth Amendment to the Constitution.

57. "[A] person is always entitled to the assistance of an attorney whether in custody or not. Of course, if [s]he is not in custody, [s]he may exercise that right when and where [s]he wishes. If [s]he is in custody, [s]he may still exercise [her] right to an attorney and the state may not unreasonably restrict that right." *Kunzler v. Pima County Superior Court*, 154 Ariz. 568, 744 P.2d 669 (Ariz. 1987).

58. By denying her unequivocal request to consult with counsel, SPD violated Ms. Garcia's right to counsel as guaranteed by federal and state law.

## COUNT THREE
### *False Arrest*

59. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for the unlawful arrest of Yessenia.

60. The tort of False Arrest is "the unlawful detention of a person without [her] consent." *Slade v. City of Phoenix,* 112 Ariz. 298, 541 P.2d 550 at 552 (Ariz. 1975). "In general, a police officer may arrest a person without a warrant only if the officer has probable cause to believe that an offense has been committed and the person to be arrested is the offender. See A.R.S. § 13-3883(A) (codifying probable cause requirement for arrest)." *State v. Morris*, 246 Ariz. 154, 435 P.3d 1060 at 1063 (Ariz. App. 2019).

61. It is undisputed that SPD did not obtain a warrant for Yessenia's arrest. Yessenia did not consent to her detention. The facts available to SPD at the time of arrest did not

constitute probable cause that Yessenia was guilty of any offense. Accordingly, her arrest was unlawful and constituted a false arrest.

## COUNT FOUR
### *False Imprisonment*

62. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for the unlawful imprisonment of Yessenia.

63. The tort of False Imprisonment is "the unlawful detention of a person without [her] consent." *Slade v. City of Phoenix,* 112 Ariz. 298, 541 P.2d 550 at 552 (Ariz. 1975). "In general, a police officer may arrest a person without a warrant only if the officer has probable cause to believe that an offense has been committed and the person to be arrested is the offender. See A.R.S. § 13-3883(A) (codifying probable cause requirement for arrest)." *State v. Morris*, 246 Ariz. 154, 435 P.3d 1060 at 1063 (Ariz. App. 2019).

64. Because Yessenia was arrested without warrant or probable cause, the ensuing detention resulting therefrom was unlawful and constitutes False Imprisonment.

## COUNT FIVE
### *Invasion of Privacy - False Light*

65. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for a violation of Plaintiff's Civil Rights under the Fourth Amendment to the United States Constitution, with regard to the unlawful seizure of Yessenia.

66. The tort of False Light is the invasion of a person's privacy by placing her before the public in a false light by making, saying or writing a public statement about the person that creates a false impression that would be highly offensive to a reasonable person and where the person making, saying or writing the statement failed to use reasonable care in determining that the statement would create a false impression and such statement caused actual damages. *Godbehere v. Phoenix Newspapers, Inc., 162 Ariz. 335, 783 P.2d 781 (Ariz. 1989).*

67. Because Defendants made false statements about Plaintiff to the public that conveyed a false impression of her that would be highly offensive to a reasonable person and failed to exercise due care in creating the false impression, which caused Plaintiff damages, Defendants committed the tort of False Light.

### COUNT SIX
*Defamation*

68. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for Defamation of Yessenia.

69. The tort of Defamation is the making, saying or writing a defamatory statement of fact about a person which is false, is made to a third person, is made with negligence in failing to determine the truth of the statement and causes harm to the person.

70. Because Defendants made false statements about the Plaintiff to third parties, were negligent regarding the truthfulness of those statements and thereby caused harm to Plaintiff, they committed the tort of defamation.

71. Plaintiff incorporates by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for a violation of Plaintiff's Civil Rights under the Fourth Amendment to the United States Constitution, with regard to the unlawful seizure of Yessenia.

### COUNT SEVEN
*Intentional Infliction of Emotional Distress*

72. Plaintiffs incorporate by reference the allegations of Paragraphs 1-49, as though fully set forth, as they relate to a cause of action for the intentional infliction of emotional distress.

73. Throughout this entire incident, Defendants' repeated reckless disregard for and violation of Plaintiff's rights alleged herein, shows that Defendants, each of them, engaged in extreme and outrageous conduct, intended to cause Plaintiff's emotional distress and/or

recklessly disregarded the near certainty that such distress would result from their conduct, and that Plaintiff did experience severe emotional distress as a result of Defendants' conduct. See *Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (1995) (citing Ford, 153 Ariz. at 43, 734 P.2d at 585).

74. As a direct and proximate result of Defendants' conduct and constitutional violations, and in accordance with 42 U.S.C. §1983, Plaintiff has suffered and will continue to suffer, damages, including but not limited to, severe emotional distress, physical and/or mental anxiety and anguish.

75. Defendants' malicious, despicable, and/or wrongful conduct as herein alleged was intentional, done with malice, and/or with a conscious disregard for Plaintiff's rights, and as a result of this conduct, Plaintiff is entitled to recover punitive damages according to proof at trial.

**COUNT TEN**
*Monell Liability*

76. Plaintiffs incorporate by reference the allegations of Paragraphs 1-??, as though fully set forth, as they relate to a cause of action for the violation of Plaintiffs' constitutional rights granted to them pursuant to 42 U.S.C. § 1983, as well as the case *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments, including but not limited to: the City of Scottsdale policies advising suspects that they have no right to consult with counsel prior to arrest.

77. By acting with deliberate indifference in implementing a policy, practice, or procedure of non-existent and/or inadequate training, and/or by failing to train their respective officers, agents and employees, in providing for the Constitutional protections guaranteed to individuals, including those under the Fourth, Fifth, Sixth and Fourteenth Amendments, when performing actions related to the investigation of DUI and Hit and Run. Defendant City of Scottsdale, as well as SPD as agents of the City of Scottsdale, had duties to Plaintiff at all

times to establish, implement and follow policies, which confirm and provide for the protections guaranteed Plaintiff under the United States Constitution, including the Fourth, Fifth and Sixth Amendments; to use reasonable care to select, supervise, train, control, and review the activities of all agents, officers, and employees in their employ, including SPD; and further, to refrain from acting with deliberate indifference to the Constitutional rights of Plaintiff herein so as to not cause the Plaintiff the injuries and damages alleged herein.

78. Defendant City of Scottsdale breached its duties and obligations to Plaintiffs, including, but not limited to, failing to establish, implement and follow the correct and proper constitutional policies, procedures, customs, and practices, by failing to properly select, supervise, train, control, and review their respective agents and employees as to their compliance with constitutional safeguards; and by permitting named Defendants, and other defendants whose identities are not yet known, to engage in unlawful and unconstitutional conduct as herein alleged.

79. Defendant City of Scottsdale knew, or should have known, that by breaching the aforesaid duties and obligations that it was foreseeable that it would, and did cause Plaintiff to be injured and damaged by the wrongful polices and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their respective legal duties and obligations to Plaintiffs.

80. Defendant City of Scottsdale also provided inadequate and/or non-existent training including but not limited to the non-existent and/or inadequate training on the Fourth, Fifth, Sixth and Fourteenth Amendments as same apply in the context of a DUI/Hit and Run investigation that may involve seizure of the Plaintiff and denial of her right to consult with an attorney.

81. As a direct and proximate result of Defendants actions or inactions in relation to Defendants' policies, practices, procedures, and/or customs, and/or non-existent/inadequate training, and in accordance with 42 U.S.C. §1983, Plaintiffs' civil rights have been violated to such an extent that they have suffered and will continue to suffer, general and special

damages, including but not limited to, physical and/or mental anxiety and anguish, as well as incurring attorney fees, costs, and expense, including those as authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

## JURY DEMAND

Plaintiffs demand a jury trial to all issues so triable.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants, as to all causes of action, as follows:

1. Award of general, special and compensatory damages in an amount to be proven at trial, but in no event less than $300,000.00;

2. Punitive damages against individually named Defendants, as allowed by law;

3. Attorneys' fees pursuant to 42 U.S.C. § 1988, and any other appropriate statue;

4. Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief to be based upon a separate application);

5. Costs of suit incurred herein; and

6. Such other and further relief as the Court may deem just and proper.

DATED this \_\_\_\_ day of May, 2021.

                         TAIT & HALL, PLLC

                         By:_____
                            4455 E. Camelback Rd., Suite C250
                            Phoenix, Arizona 85018
                            Attorneys for Plaintiff